UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Ecolab Inc.,                              File No. 23-cv-1259 (ECT/ECW)

       Plaintiff and
       Counter-Defendant,

v.                                        **OPINION AND ORDER**

Ace Property and Casualty Insurance
Company,

       Defendant and
       Counter-Claimant.

---

Christine Haskett and Breanna Katherine Jones, Covington & Burling LLP, San Francisco, CA, and Heather Habes, Covington & Burling LLP, Los Angeles, CA, and Aaron M. Johnson and O. Joseph Balthazor, Jr., Taft Stettinius & Hollister LLP, Minneapolis, MN, for Plaintiff and Counter-Defendant Ecolab Inc.

Lawrence Klein, Dac Beachcroft, New York, NY, and Joel T. Wiegert, Hinshaw & Culbertson LLP, Minneapolis, MN, for Defendant and Counter-Claimant Ace Property and Casualty Insurance Company.

---

The overarching issue in this diversity case is whether Defendant Ace Property and Casualty Insurance Company[1] must cover losses that Plaintiff Ecolab incurred in defending and settling fifteen California-venued personal-injury lawsuits. The plaintiffs in those suits alleged they sustained injuries caused by exposure to Ecolab's OxyCide disinfectant product.

---

[1] Though "Ace Property and Casualty Insurance Company" is the sued defendant, neither party uses this corporate name. Ecolab refers to Ace as "Chubb." Defendant refers to itself as "ACE." This order adopts Defendant's nomenclature and refers to Defendant as "ACE."

Hoping to streamline proceedings, the parties stipulated that Ecolab could bring an early, partial summary-judgment motion. The motion first seeks a decision regarding whether Minnesota or California applies to the coverage dispute. If Minnesota law applies, the motion next seeks a decision regarding how Minnesota law affects Ecolab's retained-limit exposure under the ACE polices with respect to one of the California suits—the "*Slamer*" case.

Though the choice-of-law issue is not clear-cut, I conclude that Minnesota law governs the coverage dispute, largely because Minnesota has a greater "governmental interest" in the case than California. And I conclude that Minnesota law requires Ecolab to exhaust one retained limit for the *Slamer* case because the case arose from a "discrete and identifiable event," as the Minnesota Supreme Court defines this insurance-coverage concept.

I[2]

*Ecolab and its OxyCide product*. Ecolab is incorporated under Delaware law and maintains its principal place of business in Minnesota. First Am. Compl. [ECF No. 106] ¶ 2. Ecolab "provides water, hygiene, and infection prevention solutions and services." *Id.* Ecolab's OxyCide product is "a one-step disinfectant for use in hospitals that is effective against *Clostridioides difficile* (formerly *Clostridium difficile*) spores, *Candida auris* and a broad spectrum of other organisms." *OxyCide Daily Disinfectant Cleaner*, Ecolab,

---

[2]     Part I describes undisputed facts at a high level. Other more specific facts will be considered in analyzing the choice-of-law and allocation issues addressed in Part II. Page citations are to a document's CM/ECF pagination appearing in the upper righthand corner, not to a document's original pagination.

https://www.ecolab.com/offerings/concentrated-cleaners-and-disinfectants/OxyCide-daily-disinfectant-cleaner (last visited June 22, 2025).  Ecolab manufactures OxyCide "primarily in a facility in Martinsburg, West Virginia."  ECF No. 131 ¶ 3.  "Ecolab does not manufacture OxyCide in Minnesota, and more generally, does not perform substantial commercial manufacturing in Minnesota."  *Id*.[3]

*ACE and its issuance of the relevant policies to Ecolab*.  ACE is incorporated under Pennsylvania law and maintains its principal place of business in Philadelphia.  First Am. Compl. ¶ 3.  ACE issued nine successive liability insurance policies to Ecolab beginning in December 2011 and continuing through December 2020.  First Am. Compl. ¶ 9; ECF

---

[3]    ACE says that Ecolab manufactures OxyCide in Minnesota, but this factual contention is not supported in the way Rule 56 requires.  To show that Ecolab manufactures OxyCide in Minnesota, ACE relied on a document entitled "S&P Capital IQ" that describes "Ecolab Inc. | Products & Services."  ECF No. 124-4.  The document displays information in five categories: "Product Name," "Company," "Primary Industry," "Geography," and "Source."  *Id.*  The document's third page (the fourth page on CM/ECF), references "OxyCide" in the "Product Name" category and "Minnesota" in the corresponding "Geography" category.  *Id.* at 4.  In a declaration accompanying this document, ACE's counsel testifies that the "Geography" category represents "the geography of the product's manufacture."  ECF No. 124 ¶ 6.  The document does not give definitions for any of its five categories, *see* ECF No. 124-4, and "Geography" as a category could mean many things.  Why, for example, couldn't it mean the location of the Ecolab division or department responsible for overseeing OxyCide's sales and marketing?  No explanation is provided to show why "Geography" means the place of each listed product's manufacture.  *See* ECF No. 124 ¶ 6.  Without this information, I cannot conclude that this aspect of the supporting declaration is "made on personal knowledge" or "show[s] that the . . . declarant is competent to testify on the matters stated."  Fed. R. Civ. P. 56(c)(4).  In any event, it seems ACE no longer relies on this assertion.  In response to ACE's allegation that Ecolab manufactures OxyCide in Minnesota, Ecolab filed a declaration from its treasury director who testified that OxyCide is manufactured primarily in West Virginia and not in Minnesota.  ECF No. 131 ¶ 3.  ACE did not address this evidence in its sur-reply brief.  *See generally* ECF No. 139.  Nor did it continue to press the claim that Ecolab manufactures OxyCide in Minnesota.  *Id.*

No. 120 ¶ 3; *see also* ECF No. 120-1.  The policies were brokered by Marsh USA Inc. at its New York office and issued to Ecolab at its St. Paul, Minnesota headquarters.  *See* ECF No. 120-1 at 2.  A Minnesota-based Ecolab employee—its Treasury Director, Risk Management—oversaw "the insurance policy underwriting process with Ecolab's brokers and insurers, including ACE."  ECF No. 120 ¶ 2; *see* ECF No. 123 at 12.

*The at-issue policy terms.*  The parties agree that the material terms are identical across all nine policies ACE issued to Ecolab.  *See* ECF No. 118 at 7 n.3; ECF No. 123 at 8–9.  The policies required ACE to "pay on behalf of [Ecolab] those sums in excess of the 'retained limit' that [Ecolab] becomes legally obligated to pay as damages because of 'bodily injury.'"  ECF No. 120-1 at 9.  Ecolab's "retained" limit was $5 million per occurrence and $15 million in the aggregate.  *Id.* at 94.  The policies covered "'bodily injury' . . . caused by an 'occurrence' . . . during the 'policy period.'"  *Id.* at 9.  With respect to "bodily injury," the policies defined "occurrence" to mean "an accident, including continuous or repeated exposure to substantially the same general harmful conditions.  All such exposure to substantially the same general conditions shall be considered as arising out of the same 'occurrence', regardless of the frequency or repetition thereof, or the number of claimants."  *Id*. at 25.  The policies provided coverage up to $25 million per occurrence and $25 million in the aggregate.  *Id.* at 2.  No policy contained a choice-of-law provision.

*The underlying OxyCide lawsuits generally*.  Plaintiffs across the United States sued Ecolab for alleged bodily injuries arising from exposure to OxyCide.  The plaintiffs in the underlying lawsuits generally alleged that OxyCide includes "dangerous chemicals and

compounds that are known to cause adverse health effects," including its chemical component "peracetic acid . . . a known asthmagen (asthma causing substance) and respiratory sensitizer (causing immune responses and adverse respiratory effects, even at low levels of exposure)."  *See, e.g.*, ECF No. 121-1 at 3, 49.  The plaintiffs alleged that hospital workers' use of OxyCide caused "serious physical injuries" including "burning eyes, nose, throat, nasal problems, cough, headache, dizziness, nausea, nose bleeds, asthma-like symptoms, respiratory irritation, skin burns, rashes and other reactions affecting their pulmonary and respiratory functions (e.g. fatigue, shortness of breath, congestion, coughing, and asthma)."  *See id.*  Ecolab notified ACE of eighty-five lawsuits related to OxyCide products.  ECF Nos. 124 ¶ 4, 124-2.  Fifteen of these cases were venued in a state or federal court in California.  *See* ECF No. 124-2.  Seventy cases were venued in Minnesota.  *See id.*

   *Factual allegations underlying the Slamer lawsuit.*  Jennifer and Christopher Slamer filed suit in the Superior Court of the State of California, San Bernadino County, seeking recovery for Jennifer's alleged injuries due to "short-term exposure" to OxyCide.  *See* ECF No. 121-1 at 2–46.  According to the complaint in that case, Jennifer was a registered nurse at Kaiser Foundation Hospitals when she first was exposed to OxyCide.  *Id.* ¶¶ 5, 10–11.  Before her OxyCide exposure, Jennifer was "in excellent health with no history of allergies or asthma, and no signs or symptoms of allergies or asthma."  *Id.* ¶ 11; *see also id.* ¶ 31–32.  Beginning in 2015, "shortly after [Kaiser] began using [OxyCide]," Jennifer "began experiencing burning sensations in her nose, eyes, and throat" whenever Kaiser cleaning staff used OxyCide to disinfect a patient room or area.  *Id.* ¶¶ 29–30.  Then, on February 15,

2016, while working near the nurses' station across from a room being cleaned by a Kaiser staff member using OxyCide, Jennifer "immediately began experiencing itching eyes, burning throat, tightness in her chest, shortness of breath, and acute respiratory failure causing her to collapse and be admitted to Kaiser's intensive care unit." *Id*. ¶ 11; *see also id.* ¶¶ 5, 32. Jennifer "was diagnosed with vocal cord dysfunction, bronchospasm, and acute respiratory failure and was kept in the intensive care unit ('ICU') for 5 days." *Id.* ¶ 33. She "suffered severely burned vocal cords, which required approximately six (6) surgeries for treatment and relief," and "[s]he still has a tracheostomy." *Id*.

*The Slamer lawsuit's procedural history.* A jury trial in the *Slamer* case began on January 9, 2023. *See Slamer v. Ecolab, Inc.*, No. CIVDS1709131, (Cal. Super. Ct., San Bernardino Cnty.), Jan. 9–Apr. 19, 2023 Dkt. entries. On April 19, 2023, before the case reached the jury, the case settled. *See id.*; First Am. Compl. ¶ 37; *see also* ECF No. 124 ¶ 15. As part of the settlement, "Ecolab paid one 'retained limit' and [ACE] paid the rest of the settlement." First Am. Compl. ¶ 39. And, as part of the settlement, "Ecolab and [ACE] agreed that while [ACE] paid the amount of the settlement above one retained limit, it did so without prejudice to any coverage dispute between Ecolab and [ACE], including the instant dispute as to the number of 'retained limits' Ecolab must satisfy, erode, or exhaust before any [ACE] Policy would respond, if at all." *Id.* ¶ 40.

*The settlement of other OxyCide cases.* On July 6, 2023, Ecolab settled seventeen cases venued in the District of Minnesota. *See* ECF No. 123 at 14; ECF No. 124-2; ECF

No. 124-12.[4]  On August 28, 2023, Ecolab settled another case brought in a federal court in California.  *See Garcia v. ECOLAB Inc*., No. 2:22-CV-07895 (C.D. Cal.); ECF No. 124-13.  Ecolab subsequently advised ACE that it had settled "all of the remaining California cases."  ECF No. 124-14.

*This case*.  On January 11, 2023, Ecolab filed suit against ACE in the United States District Court for the Central District of California, seeking resolution of ACE's defense and indemnity obligations for Ecolab's losses in the OxyCide lawsuits, including the *Slamer* lawsuit.  *See* ECF No. 1 (*Ecolab Inc. v. ACE Property and Cas. Ins.*, No. 2:23-cv-00190 (C.D. Cal. Jan. 11, 2023)).  On March 20, 2023, ACE filed a case seeking essentially the opposite relief against Ecolab in this District.  *See ACE Property & Cas. Ins. Co. v. Ecolab Inc*., No. 23-cv-670 (ECT/ECW), ECF No. 1.  On May 3, 2023, the federal court in California transferred Ecolab's case to this District.  *See* ECF Nos. 57–58. Following transfer, ACE and Ecolab agreed to consolidate the two cases by dismissing ACE's action (No. 23-cv-670 (ECT/ECW)), allowing Ecolab to file an Amended Complaint in this action, and allowing ACE to "re-formulate its claims in response as a counterclaim to Ecolab's amended complaint."  ECF No. 104 at 1–2.

---

[4]      In its opposition brief, ACE wrote: "By mediation on or about . . . July 6, 2023, Ecolab settled 17 cases venued in the District of Minnesota." ECF No. 123 at 14 (citing ECF No. 124-12).  The cited exhibit—ECF No. 124-12—does not show the jurisdictions in which the settled cases were pending.  Another exhibit—ECF No. 124-2—lists the jurisdiction of each of the eighty-five OxyCide lawsuits.  When the two exhibits are compared, there are 17 cases venued in the District of Minnesota appearing on ECF No. 124-2 that also appear on ECF No. 124-12 as "settled via mediation" on July 6, 2023.

II

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A fact is "material" only if its resolution might affect the outcome of the suit under the governing substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute over a fact is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*  "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [their] favor." *Id.* at 255.

A

Begin with the choice-of-law question.  "In a diversity case, a federal court applies the choice of law rules of the forum state."  *Nw. Airlines, Inc. v. Astraea Aviation Servs., Inc.*, 111 F.3d 1386, 1393 (8th Cir. 1997).  Minnesota answers choice-of-law questions in three steps.  "[T]he first consideration is whether the choice of one state's law over another's creates an actual conflict."  *Jepson v. Gen. Cas. Co. of Wis.*, 513 N.W.2d 467, 469 (Minn. 1994) (citation omitted).  If a conflict exists, the next question is "whether the law of both states can be constitutionally applied"—*i.e.*, whether each state has "a significant contact or significant aggregation of contacts, creating state interests, such that choice of its law is neither arbitrary nor fundamentally unfair."  *Id.* at 469–70 (quoting *Allstate Ins. v. Hague*, 449 U.S. 302, 312–13 (1981)).  If the answer to both threshold questions is "yes," then the court applies five "choice-influencing factors" to determine which state's law should apply: "(1) predictability of result; (2) maintenance of interstate

8

and international order; (3) simplification of the judicial task; (4) advancement of the forum's governmental interest; and (5) application of the better rule of law." *Id.* at 470 (citing *Milkovich v. Saari*, 203 N.W.2d 408, 412 (Minn. 1973)). The choice-influencing factors "were not intended to spawn the evolution of set mechanical rules but instead to prompt courts to carefully and critically consider each new fact situation and explain in a straight-forward manner their choice of law." *Id.* Courts are to "wrestle with each situation anew," and "be true to the method rather than to seek superficial factual analogies between cases and import wholesale the choice of law analysis contained therein." *Id.*

Here, the first two threshold questions are not disputed. Ecolab and ACE agree that California and Minnesota law conflict. *See* ECF No. 118 at 13–14, 17 n.5; ECF No. 123 at 10–11, 21; ECF No. 129 at 6.[5] Though ACE argued in its briefing that California law

---

[5] Ecolab and ACE describe the conflict differently. As Ecolab describes it, California law would treat the OxyCide lawsuits as involving "continuing injuries," require Ecolab to "pay only one retained limit for all of the lawsuits," and make ACE "responsible for all defense and indemnity for all of the lawsuits above the retained limit." ECF No. 118 at 13–14. Ecolab says Minnesota law would treat the OxyCide lawsuits as involving a "discrete and identifiable event," require Ecolab to "pay one retained limit for [each] policy period in which" such an event occurred, and make ACE "responsible for any defense and indemnity above that retained limit for each lawsuit." *Id.* at 14. As ACE describes the conflict, "[u]nder California law, under certain circumstances, an insured may access excess insurance if underlying insurance for the same period is exhausted, even for a continuing loss." ECF No. 123 at 21. "Under Minnesota law," ACE says, "damages can be allocated across policy periods pro-rata by time-on-risk." *Id.* Notwithstanding these different descriptions, the parties agree on what will result from the conflict's resolution. In their stipulation framing this motion, the parties agreed that, if California law applies, "Ecolab [would] seek[] coverage for all of the California OxyCide lawsuits, as set forth in its Amended Complaint." ECF No. 104 at 4. And if Minnesota law applies, the parties agree that "Ecolab's claim for coverage [would be] limited to losses related to the underlying *Slamer* case," along with a claim for defense costs in one other California-venued OxyCide case. *Id.*; *see also* ECF No. 118 at 5 n.1 ("Under Minnesota law, Ecolab would be entitled to the same coverage for the *Slamer* lawsuit as it would under California

cannot constitutionally be applied, *see* ECF No. 123 at 21; ECF No. 139 at 4–5, it withdrew this contention at the hearing. The choice-of-law question, then, depends on the application of Minnesota's choice-influencing factors.

(1) "Predictability of results applies primarily to consensual transactions where the parties desire advance notice of which state law will govern in future disputes." *Myers v. Gov't Emps. Ins.*, 225 N.W.2d 238, 242 (Minn. 1974). "The objective of the predictability factor is to fulfill the parties' justified expectations." *Lommen v. City of E. Grand Forks*, 522 N.W.2d 148, 150 (Minn. Ct. App. 1994) (citing Robert A. Leflar, *Choice-Influencing Considerations in Conflicts Law*, 41 N.Y.U. L. Rev. 267, 297 (1966)). This factor "represents the ideal that litigation on the same facts, regardless of where the litigation occurs, should be decided the same to avoid forum shopping." *Nodak Mut. Ins. v. Am. Fam. Mut. Ins.*, 604 N.W.2d 91, 94 (Minn. 2000) (citing Leflar, *supra*, at 282–83). In *Jepson*, the Minnesota Supreme Court addressed an insured's entitlement to underinsured motorist benefits arising from a motor-vehicle accident and described the predictability-of-results factor as follows:

> Predictability of result is of value in analyzing the contract aspects of a case. While where an accident occurs is unimportant, the obligations the insurer has to the insured at that time are important. The heart of the bargain between the insurer and the insured is the coverage the insured purchased. The parties enter into the insurance contract with the expectation that, should a dispute arise, the legal system will endeavor to give each side the benefit of their bargain. To the extent the choice of law in this case contributes to giving the

---

law. However, . . . Ecolab would not be entitled to coverage from [ACE] for the other OxyCide Lawsuits under Minnesota law, unlike under California law.").

> parties the benefit of their bargain, it enhances the
> predictability of the parties' contractual arrangements.

*Jepson*, 513 N.W.2d at 470.

Here, predictability of results is best served—not by applying Minnesota law based merely on Ecolab's Minnesota presence and the policies' issuance to Ecolab there—but by weighing dispute-specific considerations and giving greater weight to other choice-influencing factors to determine whether California or Minnesota law should apply to resolve the at-issue coverage questions. This approach is more consistent with the parties' reasonable expectations as reflected in the policies' terms and record evidence regarding the policies' negotiation history. The parties did not contract for advance notice of governing law—that is, the policies contained no choice-of-law clause though they insured Ecolab's liability nationwide. Without a choice-of-law clause, the parties effectively opted for a case-by-case approach to resolving choice-of-law questions. And the parties had to see it coming. Prior to renewing each policy, Ecolab provided ACE with information showing Ecolab's loss history, including filed cases, each case's status, and loss amounts for each case. ECF No. 124-7 ¶ 6. This information showed, among other things, that for the thirteen years preceding the 2014–2015 renewal Ecolab's California-based losses "were more than 34 times the Minnesota-based losses and represented almost one-third of then-current claim expenses nationwide." *Id.* It was, in other words, plain

that Ecolab would incur covered liabilities outside Minnesota and that it likely would continue to incur a significant portion of its covered liabilities in California.[6]

Though Ecolab maintained (and continues to maintain) its primary place of business in Minnesota, no evidence shows this affected either party's choice-of-law expectations in a material way. The policies were drafted almost entirely without regard to Ecolab's Minnesota presence. The exception is that the policies included Minnesota-specific cancellation and renewal provisions. ECF No. 120-1 at 4, 83–84. The better answer, however, is that these provisions do not bear significantly on the predictability-of-results factor. The Minnesota-specific provisions appeared in an endorsement of less than two pages in a policy of more than one hundred pages, they did not relate directly to coverage, and they have no obvious relevance here. Regardless, the Minnesota Supreme Court has made clear that predictability of results is not served "by simply applying the law of the state where the policy was written." *Nodak Mut. Ins.*, 604 N.W.2d at 94.

Based on these considerations—the absence of a choice-of-law clause, the policies' nationwide coverage, Ecolab's national and California-specific loss histories, the lack of connection between the policies' terms and Minnesota law, and the comparatively little weight Minnesota law attributes to the fact that the policies were written to a Minnesota-based company—Ecolab and ACE should reasonably have expected that a

---

[6]    Ecolab asserts that ACE "charge[d] higher premiums based on the significant losses that Ecolab experiences in California compared to other locations." ECF No. 129 at 15. If true, this fact would contribute to showing the predictability of applying California law. The problem is that this assertion lacks any record citation, *see id.*, and if the record includes information to support the assertion, I haven't found it. For these reasons, the assertion's truth is not accepted.

choice of law to govern any particular coverage dispute would depend on occurrence- and claim-specific features, not merely Ecolab's Minnesota presence. In other words, the parties chose case-by-case resolution of choice-of-law questions, and the idea that non-Minnesota law might more appropriately govern a coverage dispute between Ecolab and ACE should not surprise them.

Ecolab and ACE advocate for more straightforward approaches to the predictability-of-results factor, but their arguments are not persuasive. Ecolab argues that "[w]hen the insurance policy at issue does not include a choice of law provision, Minnesota courts generally apply the law of the state where the insured losses occurred, rather than the law of the state where the insurance policy was issued or where the insured was a resident." ECF No. 118 at 15. This is not correct. Minnesota applies the choice-influencing considerations. These considerations do not include a general rule favoring the law of the state where the losses occurred. The Minnesota Supreme Court has applied the law of a state where the insured loss did not occur without describing its decision as an "exception" to a general rule. *See Jepson*, 513 N.W.2d at 469–73 (applying North Dakota law when insured losses occurred in Arizona). Indeed, in *Jepson*, the court described the location of an insured loss as "unimportant" to analyzing predictability of results. *Id.* at 470. Though the three cases Ecolab cites to support this contention apply the law of the state where the losses occurred, none articulated a general rule favoring that approach. *See Hime v. State Farm Fire & Cas. Co.*, 284 N.W.2d 829 (Minn. 1979); *Med. Graphics Corp. v. Hartford Fire Ins. Co.*, 171 F.R.D. 254, 260–63 (D. Minn. 1997); *U.S. Fire Ins. Co. v. Goodyear Tire & Rubber Co.*, 726 F. Supp. 740, 741, 743–45 (D. Minn. 1989). Ecolab

separately argues that California law should apply because the policies included endorsements covering California-based organizations. *See* ECF No. 118 at 8, 18. In addition to endorsements covering these organizations, however, the policies included endorsements covering an organization in New York and New Jersey. ECF No. 120-1 at 3. It is difficult to understand why the California-specific endorsements deserve controlling weight versus the New York- and New Jersey-specific endorsements. It is also difficult to understand why the California-specific endorsement should be given weight because they have no relevance to the coverage questions here.

ACE, for its part, argues that the predictability-of-results factor favors applying Minnesota law based on Ecolab's Minnesota presence. *See* ECF No. 123 at 22–24. To support this contention, Ecolab relies primarily on two Minnesota Court of Appeals decisions, *Cargill, Inc. v. Evanston Insurance* , 642 N.W.2d 80 (Minn. Ct. App. 2002), and *St. Paul Mercury Insurance v. Northern States Power Co.*, No. A07-1775, 2009 WL 2596074 (Minn. Ct. App. Aug. 25, 2009). These cases are not helpful here, at least insofar as they address predictability of results. In *Cargill*, the Court of Appeals addressed what state's law should apply to a coverage dispute between Minnesota-based Cargill and its Illinois-based insurer over environmental contamination at a Cargill-owned property in Georgia. 642 N.W.2d at 82–84, 89–90. The court concluded "that if any states are to be involved in a choice-of-law analysis, it should be Minnesota and Illinois, the home states of the parties to the litigation," not Georgia, the state where the loss occurred. 642 N.W.2d

at 89–90.[7]   The court recognized Georgia's interest in "cleaning up contamination discovered within its borders," but observed that Georgia had "comparatively minimal interest in determining who should pay for the cleanup of that contamination."  *Id.* at 89. The court continued,

> Application of Georgia law in this case would indicate that the law of each state where Cargill's properties are located could potentially control whether Cargill has insurance coverage under the [environmental impairment liability] policy.   It strains credulity to believe that either party to this contract of insurance could have intended such a result.

*Id.*   In arriving at this result, the court did not explicitly analyze Minnesota's choice-influencing factors one-at-a-time or in regular order.  *See id.* at 89–90.  And the decision to give controlling weight to the insured and insurer's home states seems at odds with Minnesota Supreme Court cases.  *See Nodak Mut. Ins. Co.*, 604 N.W.2d at 94; *see also Hime*, 284 N.W.2d at 833.   In *St. Paul Mercury Insurance*, the court essentially followed *Cargill* in concluding that the insured's Minnesota location meant the parties "could have fairly anticipated that the insurance contracts might be construed under Minnesota law."  2009 WL 2596074, at *4.  This analysis is not persuasive regarding the predictability-of-results factor in this case for the same reasons *Cargill* isn't.

(2) The maintenance-of-interstate-order factor concerns "whether the application of Minnesota law would manifest disrespect for [California's] sovereignty or impede the interstate movement of people and goods."  *Jepson*, 513 N.W.2d at 471.  The focus is on

---

[7]    ACE does not argue that the law of its home state, Pennsylvania, should be applied here.

the contacts that each competing state has with the dispute. "[W]here a state 'has little or no contact with a case and nearly all of the significant contacts are with a sister state, the factor suggests that a state should not apply its own law to the dispute.'" *Burks v. Abbott Lab'ys*, 639 F. Supp. 2d 1006, 1013 (D. Minn. 2009) (quoting *Hughes v. Wal-Mart Stores, Inc.*, 250 F.3d 618, 620–21 (8th Cir. 2001)); *accord Johnson v. Parrish Tire Co.*, No. 06-cv-2267 (MJD/SRN), 2009 WL 10677525, at *5 (D. Minn. Mar. 30, 2009) ("[M]aintenance of interstate order weighs in favor of the state that has the most significant contacts with the facts relevant to the litigation."); *see also Perry, Tr. for Sherrell v. Beltrami County*, 520 F. Supp. 3d 1115, 1123 (D. Minn. 2021) ("The primary focus is on the contacts that each competing state has with the dispute.").

Considering this case's subject matter, California's suit-related contacts are more significant than Minnesota's. This case is about the extent to which (and perhaps whether) ACE must cover Ecolab's losses stemming from fifteen OxyCide-related lawsuits filed in California. *See* First Am. Compl. ¶ 1 (defining "OxyCide Lawsuits" as "lawsuits filed in California alleging bodily injury arising from the purported use of Ecolab's OxyCide product."). Fourteen of these lawsuits arose from OxyCide exposure in California.[8] *See* ECF Nos. 124 ¶ 4, 124-2 at 9–11. Ecolab and ACE agree that the legal characterization of these lawsuits' facts will affect coverage determinations. In its First Amended Complaint, Ecolab alleges the California OxyCide lawsuits meet "California's continuing injury trigger rule," in part because they include allegations of "continuous, progressively

---

[8]    One of the lawsuits, *Martin v. Ecolab, Inc.*, involves OxyCide exposure in Oregon. *See* ECF No. 124-2 at 10.

deteriorating injuries" when the ACE policies were in effect.  First Am. Compl. ¶¶ 47–48.

Ecolab alleges more specifically that the California OxyCide lawsuits allege

"'sensitization' that resulted from the plaintiffs' exposure to OxyCide, causing increasingly

serious reactions to ordinary chemicals and scents."  *Id.* ¶ 48.  In its Counterclaim, ACE

alleged that the time periods implicated by at least Jennifer Slamer's California suit are

disputed and will determine what underlying coverage "must be appropriately exhausted

before the corresponding ACE Policy would respond, if at all."  ECF No. 115 ¶ 50(a); *see*

*id.* ¶ 50(b).  And ACE argues that Ms. Slamer's injuries are best characterized as

continuous, intermingled, and indivisible, triggering allocation across policy periods under

Minnesota law.  ECF No. 123 at 32.  In contrast to these California contacts, Ecolab does

not seek coverage for lawsuits brought in Minnesota or for Minnesota-connected losses.

No Minnesota lawsuit or loss is mentioned in Ecolab's First Amended Complaint.  And

there is no record evidence that Ecolab manufactured OxyCide in Minnesota or took

OxyCide-related actions in Minnesota that might have affected the coverage questions in

this case.  Minnesota's most significant contacts are Ecolab's Minnesota presence and the

fact that the policies were issued to Ecolab there.

ACE advances sensible but ultimately unconvincing arguments to show that the

maintenance-of-interstate-order factor favors applying Minnesota law.  It argues that the

parties' dispute is "purely contractual" and that "none of the contacts involving negotiation

and formation of the contract involve California."  ECF No. 123 at 25–26; *see also* ECF

No. 139 at 9 (arguing that no facts "relating to the underlying actions have anything to do

with the contractual issue in dispute").  These contentions are not entirely correct.  Mere

contract interpretation won't resolve this case.  As explained in the preceding paragraph, the California lawsuits' facts and legal characterizations of those facts matter to this case's adjudication and outcome.  It is true that ACE and Ecolab were not California-incorporated or California-based when the policies were negotiated and issued.  But Ecolab's California-based loss history was part of the negotiation process.  ECF No. 124-7 ¶ 6.  ACE argues that Ecolab forum-shopped when it sued originally in California, and it says applying California law would reward that disfavored tactic.  ECF No. 123 at 25.  Though in Minnesota, the maintenance-of-interstate-order factor includes consideration of forum-shopping, *see Jepson*, 513 N.W.2d at 471, this concern is not manifested here.  The case's transfer to this District deprived Ecolab of its chosen forum.

(3) The simplification-of-the-judicial-task factor "concerns the forum court's ability to discern and apply the law of another state as compared to its own law."  *Lommen*, 522 N.W.2d at 152.  It "largely focuses on the necessity of allowing the forum state to apply its own procedural law."  *Id.*  This factor "has not been given much weight in" Minnesota Supreme Court precedent.  *Nodak Mut. Ins.*, 604 N.W.2d at 95.  Regardless, as the Eighth Circuit has explained, federal district courts routinely apply non-forum states' laws and are generally "capable of resolving the dispute" in this situation.  *Hughes*, 250 F.3d at 620.  There is no reason to think this case falls outside the general rule.

(4) The governmental-interest factor concerns "which choice of law most advances a significant interest of the forum."  *Nodak Mut. Ins.*, 604 N.W.2d at 95 (quotation omitted).  "It 'requires analysis not only of Minnesota's governmental interest, but also of [California's] public policy.'"  *Murray v. Cirrus Design Corp.*, No. 18-cv-2510

18

(NEB/LIB), 2019 WL 1086345, at *3 (D. Minn. Mar. 7, 2019) (quoting *Blake Marine Grp.*
*v. CarVal Invs. LLC*, 829 F.3d 592, 596 (8th Cir. 2016)); *see also Lommen*, 522 N.W.2d at
152 (considering "the relative policy interests of the two states").

Minnesota's governmental interest in this case is stronger than California's,
considerably so.  Ecolab is a Minnesota-based corporation.  This case's central issue
concerns whether Ecolab will be covered for losses under insurance policies issued to it in
Minnesota.  Though the losses are California-centered, and resolution of coverage
questions will depend on facts developed in the California-venued suits, California's
interest is comparatively slight.  Its citizens (who were at least fourteen of the fifteen
plaintiffs in those cases) were compensated through settlements.  Considering these
settlements' finality, it is difficult to understand why California might care about how this
coverage dispute is resolved.  There are, for example, no allegations regarding Ecolab's
inability to fund the settlements.  There are no allegations that any California plaintiff might
obtain greater settlement proceeds through this case.  The substance of Minnesota and
California's conflicting laws is consistent with these fact-specific, practical considerations.
The laws address just coverage, California's in ways that favor insureds more than
Minnesota's.  Though it makes sense that a more insured-friendly rule might lead more
often to the availability of greater proceeds to compensate an injured third party, no cited
authority clearly shows this motivated California or Minnesota to adopt the rules each has.

(5) "The better rule of law is the rule that makes 'good socio-economic sense for the
time when the court speaks.'"  *Med. Graphics*, 171 F.R.D. at 263 (quoting *Jepson*,
513 N.W.2d at 473).  "[T]his factor is applied 'only when the other four factors are not

dispositive.'" *Pesente v. Minn. Life Ins.*, 12 N.W.3d 768, 784 (Minn. Ct. App. 2024) (quoting *Schumacher v. Schumacher*, 676 N.W.2d 685, 691–92 (Minn. Ct. App. 2004)); *see also Med. Graphics*, 171 F.R.D. at 263. For reasons about to be explained, I conclude the other four factors are dispositive, meaning it is not necessary to consider this factor.

*

Though applying Minnesota's choice-influencing factors here presents a close call, I conclude on balance they favor applying Minnesota law. The governmental-interest factor is the one factor that tilts most heavily in either direction. It favors applying Minnesota law. It is true that the maintenance-of-interstate-order factor favors applying California law based on its more significant contacts with the case. In addition to a state's dispute-connected contacts, however, the Minnesota Supreme Court has said that the maintenance-of-interstate-order factor concerns "whether the application of Minnesota law would manifest disrespect for [California's] sovereignty or impede the interstate movement of people and goods." *Jepson*, 513 N.W.2d at 471. Because California lacks a governmental interest in this case, it is difficult to see how applying Minnesota law might reflect disrespect for California's sovereignty. And this is not a situation where Minnesota "has little or no contact with [this] case." *Hughes*, 250 F.3d at 620–21 (quotation omitted). The case concerns coverage for a Minnesota company's product. Minnesota law will be applied to resolve the parties' coverage disputes.[9]

---

[9]    For many reasons, I think it would be appropriate for the Minnesota Supreme Court to consider reevaluating its approach to resolving choice-of-law questions. By way of example, these reasons include the following: (1) Professor Leflar proposed his

B

Turn now to the "retained limit" question with respect to the *Slamer* case. To set the table, recall that Jennifer Slamer was first exposed to OxyCide and experienced adverse health consequences during the 2014–2015 policy period but suffered more significant adverse health consequences in the 2015–2016 policy period. As the parties frame it, the fighting issue is whether Minnesota law requires Ecolab to pay just one retained limit

---

choice-influencing considerations in 1966, and in some respects, the considerations are not a good fit with dispute resolution in 2025. Consider the simplification-of-the-judicial-task factor. In 1966, a court's ability to discern and apply the law of another state may have been hampered by a lack of complete access to another state's legal resources. Today, a court sitting in Minnesota has ready, desk-top access to an abundance of legal resources in all fifty states. It is difficult to imagine a situation where a state or federal district court judge reasonably could claim to be hindered from, or incapable of, responsibly applying another jurisdiction's laws. (2) Asking a judge to evaluate which state's law is "better" invites the judge to weigh in on policy matters that are best left to the political branches. *See* Peter Hay et al., *Conflict of Laws* § 2.13B (6th ed. 2018) (criticizing "better law" criterion as legitimizing "judicial subjectivism"); Ralph U. Whitten, *Improving the "Better Law" System: Some Impudent Suggestions for Reordering and Reformulating Leflar's Choice-Influencing Considerations*, 52 Ark. L. Rev. 177, 228 (1999) ("[U]tilizing the better law consideration to select the law of a nonforum state over the law of the forum is not a proper function of judges in a democratic society governed by the rule of law and the doctrine of separation of powers"). (3) Weighing the quantity and nature of a state's dispute-connected contacts seems like one appropriate way of assessing whether the state has an interest in a case and whether the parties should have expected that state's law to apply. In other words, it is difficult to understand how or why the maintenance-of-interstate-order factor adds separate value to the choice-of-law analysis. (4) Professor Leflar's choice-influencing factors have been criticized because they leave play in the joints and invite seemingly inconsistent decisions. *See, e.g.*, Mark Thomson, *Method or Madness?: The Leflar Approach to Choice of Law as Practiced in Five States*, 66 Rutgers L. Rev. 81, 89–90 (2013); *see also id.* at 118–27 (analyzing Minnesota courts' varying applications of Leflar factors); Gregory E. Smith, *Choice of Law in the United States*, 38 Hastings L.J. 1041, 1089–90 (1987) (analyzing Minnesota courts' application of Leflar factors, and criticizing Leflar approach as "extremely pliant," "blatantly proforum," and "distinctly proplaintiff"). Having reviewed many cases applying Minnesota's choice-influencing factors and having gone through the exercise of applying the factors here, I understand these concerns.

stemming from Ms. Slamer's initial exposure during the 2014–2015 policy period, or whether Minnesota law requires Ecolab to pay a retained limit for both the 2014–2015 and 2015–2016 policy periods because Ms. Slamer sustained cumulatively worsening injuries through both periods. Ecolab takes the former position. *See* ECF No. 118 at 23. ACE takes the latter. *See* ECF No. 123 at 32.

The answer depends on whether Ms. Slamer's injuries arose out of a "discrete and identifiable event" as the Minnesota Supreme Court has defined this insurance-coverage concept. The analytical framework in which this question is answered developed across three primary cases. The first is *Northern States Power Co. v. Fidelity and Casualty Co. of New York*, 523 N.W.2d 657 (Minn. 1994) ("*NSP*"). The case concerned costs incurred by an insured (NSP) to remediate environmental contamination at the site of a former oil and gas power plant in Faribault, Minnesota. *Id.* at 659. The issue was "how to allocate liability between insurers" for NSP's remediation costs considering the contamination occurred over many years. *Id.* at 661. The court recognized that "Minnesota follows the 'actual injury' or 'injury-in-fact' theory to determine which policies have been triggered by an occurrence causing damages for which an insured is liable." *Id.* at 662. "The essence of the actual injury trigger theory," the court explained, "is that each insurer is held liable for only those damages which occurred during its policy period; no insurer is held liable for damages outside its policy period." *Id.* After weighing several allocation options, the court held that a "'pro rata by time on the risk' allocation scheme" was consistent with Minnesota's actual-trigger theory and would promote the efficient adjudication of environmental-liability-insurance cases. *See id.* at 660–61 (discussing "special problems"

22

associated with these cases); *see also id.* at 663 (explaining efficiencies of "pro rata by time on the risk" allocation scheme). The court explained that, under this regime, an insured bears the burden to show when environmental contamination began and when the contamination was discovered. *Id.* at 663–64. Where environmental "damages occurred over multiple policy periods," the court explained, a "trial court should presume that the damages were continuous from the point of the first damage to the point of discovery or cleanup." *Id.* at 664. In this situation, the court held, "there has been one occurrence during the policy period of each applicable [insurance] policy and NSP must assume the retained limit with respect to each of these policies." *Id.*

The second case is *Domtar, Inc. v. Niagara Fire Insurance*, 563 N.W.2d 724 (Minn. 1997). Like *NSP*, this case concerned the allocation of losses arising from environmental contamination at property owned by the insured (Domtar). *Id.* at 728–29, 731–32. The defendant insurers agreed their policies had been triggered by losses occurring during each policy period but argued "that the language and logic of *NSP* dictate that Domtar bear the costs of remediation allocated to the years outside of their policy periods"—*i.e.*, years during which Domtar was self-insured. *Id.* at 732. The court rejected this argument as an overbroad reading of *NSP*. *Id.* at 733. The court explained:

> It is inaccurate to conclude that a CGL insurer is *never* liable for damages occurring outside of the policy period. CGL policies come in many forms and it is a mistake to read our case law as if the scope of coverage has been resolved for all such policies, no matter what their language. The proper scope of coverage also will depend on the facts of the case. When environmental contamination arises from discrete and identifiable events, then the actual-injury trigger theory allows those policies on the risk at the point of initial contamination

23

to pay for all property damage that follows. *See SCSC Corp. v. Allied Mut. Ins.,* 536 N.W.2d 305, 318 (Minn. 1995) (despite continuing damage from leaching of chemicals into the groundwater after the policy period, only the primary and excess policies on the risk at the time of the discharge were triggered, but those policies responded to the entire loss). This interpretation of the policies is in accord with the common understanding of the terms "occurrence" or "accident." *It is only in those difficult cases in which property damage is both continuous and so intermingled as to be practically indivisible that NSP properly applies.* NSP provides a judicially manageable way for trial courts to adjudicate certain pollution-coverage disputes when it is difficult to determine when an "event" or "occurrence" or "damage" giving rise to legal liability has occurred. *NSP* does not establish hard-and-fast rules; it offers a practical solution in the face of uncertainty. *NSP*, 523 N.W.2d at 663, 665.

*Id.* at 733–34 (second emphasis added).

The third case is *In re Silicone Implant Insurance Coverage Litigation*, 667 N.W.2d 405 (Minn. 2003) ("*3M*"). This case addressed several coverage questions arising from mass tort litigation against 3M over its silicone gel breast implants. *See id.* at 408–409. In reviewing the district court's decision to allocate 3M's losses among insurers, the court described the "guidelines" trial courts should follow to "allocate[e] losses from a continuing injury":

The first, and most obvious, is that only insurance policies that are appropriately "triggered" are on the risk. Therefore, before an allocation discussion can occur, the district court needs to identify the triggered policies among which to allocate. The second, and most helpful guideline in this case, is that when there is a continuing injury that "arises from discrete and identifiable events, then the actual-injury trigger theory allows those policies on the risk at the point of initial contamination to pay for all property damage that follows." In other words, the issue of allocation should be raised only if the triggering injury does not "arise [] from discrete and identifiable events."

24

*Id.* at 420 (alteration in original) (quotation omitted). "To trigger a policy, 'the insured must show that *some damage* occurred during the policy period,'" and for this showing's purposes, "an injury can occur even though the injury is not 'diagnosable,' 'compensable,' or manifest during the policy period as long as it can be determined, even retroactively, that some injury did occur during the policy period." *Id*. at 415 (first quoting *NSP*, 523 N.W.2d at 663; and then quoting *Am. Home Prods. Corp. v. Liberty Mut. Ins.*, 748 F.2d 760, 765–66 (2d Cir. 1984)). In this framework, "allocation is meant to be the exception and not the rule because '[i]t is only in those difficult cases' that allocation is appropriate"; if a court "can identify a discrete originating event that allows [the court] to avoid allocation, [it] should do so." *Id*. at 421–22 (quotation omitted).

Applied here, these cases warrant the entry of summary judgment in Ecolab's favor on the *Slamer* retained-limit question. This case seems indistinguishable from *3M*. There is no genuine dispute that Ms. Slamer was exposed to OxyCide first during the 2014–2015 policy period. That is what Ecolab said in its opening brief, ECF No. 118 at 23, and though the record evidence Ecolab cited to support the assertion is not explicit about the precise date Ms. Slamer was first exposed to OxyCide, ACE accepts "she was exposed to OxyCide beginning in August 2015," ECF No. 123 at 15. There also is no dispute that Ms. Slamer suffered injuries beginning with her first exposure to OxyCide. *See* ECF No. 121-1 at 80–81; ECF No. 123 at 15 (citing Ms. Slamer's operative state court complaint for the proposition "that she had suffered severe reactions due to the use of OxyCide soon after Kaiser began using OxyCide"). The court made a comparable finding in *3M*, concluding

25

that the individual plaintiffs' injuries occurred immediately after implantation.
667 N.W.2d at 414–16. And it seems most consistent with *NSP*, *Domtar*, and *3M* to
conclude that Ms. Slamer's first OxyCide exposure was a discrete and identifiable event.
We know when the event occurred. We know it caused injury in the relevant sense—that
is, alleged injury to Ms. Slamer that resulted in an occurrence and loss to Ecolab under the
2014–2015 ACE policy. Importantly, it does not matter that Ms. Slamer's injury continued
to occur and worsened over time. The insurers advanced that very contention in *3M*; they
argued that the individual plaintiffs' continuing exposure to the effects of the implants were
"equally as difficult to define and assign to specific time periods as are the damages
involved in environmental contamination cases." *Id.* at 421. The Minnesota Supreme
Court accepted the idea that the plaintiffs' injuries were ongoing and cumulative but still
rejected the insurers' argument. It explained:

> We find 3M's arguments to be more consistent with our
> analysis in *Domtar* and the district court's findings. In our
> actual-injury trigger framework, allocation is meant to be the
> exception and not the rule because "[i]t is only in those difficult
> cases" that allocation is appropriate. *Domtar,* 563 N.W.2d at
> 733. If we can identify a discrete originating event that allows
> us to avoid allocation, we should do so. Here, the district court
> labeled the time of implant as the beginning of the continuing
> injury process. The implantation, therefore, is a readily
> identifiable discrete event from which all of the plaintiffs'
> alleged injuries arose. Such implantation is more akin to the
> single spill that led to continuing soil damage in *SCSC* than it
> is to the situation in *NSP* or *Domtar* where "contamination
> could not be apportioned among causes." *Id.* at 730.
>
> Accordingly, we conclude that this case is not one of the
> "difficult cases" in which allocation is appropriate and,
> therefore, we hold that the lower courts erred in allocating the
> damages among the insurers in this case. *Id.* at 733.

26

> Consistent with our actual-injury trigger theory, we hold that those insurers on the risk at the time of implantation are liable up to the limits of their respective policies for 3M's losses arising from that implantation.

*Id*. at 421–22 (alteration in original).  Finally, it helps that this conclusion is consistent with the definition of "occurrence" appearing in the 2014–15 policy.  The policy defines "'[o]ccurrence' . . . [w]ith respect to 'bodily injury' . . . [as] an accident, *including continuous or repeated exposure to substantially the same general harmful conditions.  All such exposure to substantially the same general conditions shall be considered as arising out of the same 'occurrence', regardless of the frequency or repetition thereof*, or the number of claimants."  ECF No. 120-1 at 25 (emphasis added).

ACE's primary argument on the retained-limit question is that Ms. Slamer's lawsuit arose from cumulative exposure to OxyCide and that her exposure's cumulative nature means Ms. Slamer's injuries could not have resulted from a discrete and identifiable event.  As discussed in the preceding paragraph, I understand the Minnesota Supreme Court to have rejected this argument head-on in *3M*.  ACE advances a secondary argument—that Ecolab's litigation communications show it agreed that Ms. Slamer's injuries were cumulative.  ECF No. 139 at 13.  As factual support for this argument, ACE cites a letter in which Ecolab wrote:

> There is no question that a continuing injury trigger applies to the OxyCide situation under California law.  As [ACE] knows, the OxyCide cases allege continuing, progressively deteriorating injuries, namely 'sensitization' that resulted from the plaintiffs' repeated exposure to OxyCide, causing increasingly serious reactions to ordinary airborne particulates, including perfumes, household cleaners, laundry detergent,

> bodily odors, etc.  As a result, all [ACE] policies in effect when
> the injuries allegedly occurred are triggered.

ECF No. 124-13.  This letter does not show what ACE claims.  The letter tethered its factual

characterization of the OxyCide cases to a "continuing injury trigger" under California law.

The letter did not address the discrete-and-identifiable-event question under Minnesota

law.  Regardless, ACE cites no legal authority to support the idea that this letter's content

should prevent Ecolab from advancing any position in this case.

*

Under Minnesota law, Jennifer Slamer's injuries arose out of a "discrete and

identifiable event" as the Minnesota Supreme Court has defined that insurance-coverage

concept, meaning Ecolab must pay a retained limit for the 2014–2015 policy period only.

**ORDER**

Based on the foregoing, and on all the files, records, and proceedings herein, **IT IS**

**ORDERED THAT**:

1.    Plaintiff Ecolab's Motion for Partial Summary Judgment [ECF No. 116] is

**GRANTED IN PART** and **DENIED IN PART**.

2.    Minnesota law governs the insurance-coverage disputes in this case.

3.      Under Minnesota law, the injuries claimed by Plaintiff Jennifer Slamer in Case No. CIVDS1709131 (San Bernardino County, California) arose out of a discrete and identifiable event, meaning Ecolab must pay a retained limit for the 2014–2015 policy period only.

Dated:  June 23, 2025                          s/ Eric C. Tostrud
                                               Eric C. Tostrud
                                               United States District Court